### PRUDENTIAL INS. CO. OF AMERICA v. HARRISON et al.
### Civ. No. 13832.

United States District Court,
S. D. California, Central Division.
July 18, 1952.

James E. Wallace (of Adams, Duque & Hazeltine), Los Angeles, Cal., for plaintiff.

Vernon M. Brydolf, Pasadena, Cal., for Frances G. Harrison, as administratrix of the estate of Lucille E. Pounds, deceased.

Charles Hollopeter, Pasadena, Cal., for defendant George W. Pounds.

TOLIN, District Judge.

This is an interpleader action. Plaintiff insurance company deposited the proceeds of life insurance policies upon the life of Lucille E. Pounds into the registry of the Court. George W. Pounds, husband of decedent, Lucille E. Pounds, and Frances G. Harrison, as Administratrix of her estate, claim said proceeds. The husband's claim is based upon the fact that he is the named

beneficiary in each of the four policies. The Administratrix asserts that he is barred from recovery because he has pleaded guilty to manslaughter of the insured and, as the result of that plea, was adjudged guilty of manslaughter. She urges that Section 258, California Probate Code, bars the husband and also claims that Sections 2224 and 3517 of the Civil Code of California compel the same result.

### The Facts.

The Prudential Insurance Company issued the policies on three occasions, the earliest of which was March 13, 1939. Each policy named George W. Pounds beneficiary and husband of the insured. In each policy the insured claimed residence in California. Decedent and Mr. Pounds were living together in that State when she died.

On April 25, 1952, Mr. Pounds left his place of employment in Pasadena, stopped at a bar on the way home and had several drinks. On arrival home he and the decedent had some beer, and went to a restaurant for dinner. While seated at the bar of the restaurant, she fell into conversation with a physician she knew who had come there in response to a professional call. After some high balls, Mr. and Mrs. Pounds began to argue over what he claimed was excess attention given by her to the physician. Restaurant employees noted an active quarrel during which Mr. Pounds struck his wife a hard blow which caused her head to hit the bar. Shortly afterward Mr. and Mrs. Pounds left the bar together, having limited their patronage to alcoholic beverages and a sandwich ordered by the wife.

After arrival home, decedent followed her husband into the bath room where he had commenced to brush his teeth. The argument was resumed, and again became violent. He struck his wife. As a result, she fell into the bath tub sustaining injuries from the fall. It is patent from the autopsy that she was badly hurt by the blows. When he observed that his wife was injured, he carried her to a bed, gave aid, called medical assistance, and caused her to be taken to a hospital. He selected one where she was employed as a nurse and was known to the staff. In other ways he arranged for appropriate treatment and care. She died a few hours later. An autopsy established that there had been a fracture of her thyroid cartilage (Adam's apple), a fracture of the mandible (jaw), dislocation of the jaw, central and lateral incisors loosened, and second left rib fractured (without displacement). There were many bruises on the head and body, some lacerations, and an intra-cranial hemorrhage which the autopsy surgeon found was the immediate cause of death.

Mr. Pounds was charged with murder. The Court accepted a plea of guilty of manslaughter, declined to classify the manslaughter as either voluntary or involuntary, and imposed a term of imprisonment with a recommendation for maximum period of incarceration.

### Legal Issues and Their Determination.

Among the statutes suggested as barring husband Pounds from recovering the insurance is Section 258, California Probate Code:

"No person [who has been] convicted of the murder of the decedent shall be entitled to succeed to any portion of the estate; * * *".

That this enactment has no application appears from its language. It applies an artificial standard, i.e., "conviction" of murder. Hence if a confessed murderer should die before judgment, the statute would not operate against him, for conviction of murder, rather than its perpetration, is the *sine qua non* of Section 258, California Probate Code. Further, the statute relates only to succession in probate, which is an entirely different circumstance than is presented here. Even in probate it has been held inapplicable to a manslaughter conviction. Before codification into the Probate Code, the text was known as California Civil Code, § 1409. While so indexed, in In re Estate of Kirby, 162 Cal. 91, at page 93, 121 P. 370, 371, 39 L.R.A., N.S., 1088, treated of it thus:

"* * * a conviction of manslaughter is not a conviction of murder. It is a conviction of a different offense, an offense which does not include all the criminal elements of the crime of murder. The distinction has indeed

been carried so far that it is well settled that a conviction of manslaughter upon a charge of murder is, in legal effect, an acquittal of the murder charge. * * *"

See also, In re Estate of Agoure, 165 Cal. 427, 132 P. 587. Section 258, California Probate Code, is rejected as a bar to recovery because it is limited in application to inheritance through the avenue of probate. This is an insurance and not a probate case. As hereinafter indicated, the husband cannot benefit from his tortious action but this Code Section is not the vehicle which carries the legal result. It is also rejected because Mr. Pounds has in effect been acquitted of murder, not convicted of it. If the beneficiary is barred from recovery, it must be upon the circumstances of the violent death, not upon the record of the criminal litigation.

The Administratrix urges that Sections 2224 and 3517, Civil Code of California, raise bars to the beneficiary's recovering proceeds of the policies. These statutes provide:

Section 2224:

"(Involuntary trust resulting from fraud, mistake, etc.) One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it. (Enacted 1872.)"

Section 3517:

"No one can take advantage of his own wrong. (Enacted 1872.)"

Although Section 2224, Civil Code of California, has usually been applied to property transfer and fraud cases, the California Supreme Court in Beck v. West Coast Life Insurance Co., 38 Cal.2d 643, 241 P. 2d 544, 545, stated that these statutes barred a murderer from recovery of insurance.

"* * * Under the terms of the policy the murderer is entitled to the proceeds, but since it would be unconscionable to allow him to profit from his own wrong, he may neither receive nor retain them. Drown v. New Amsterdam Casualty Co., 175 Cal. 21, 23, 165 P. 5; West Coast Life Ins. Co. v. Crawford, 58 Cal.App.2d 771, 773, 138 P.2d 384; see also cases collected in 91 A.L.R. 1486. * * *

"The general principle that precludes a wrongdoer from unjustly enriching himself has been codified in sections 2224 and 3517 of the Civil Code and applied in a variety of situations. '(W)here the defendant has by his own wrong obtained the legal title to property, a trust as to such property will be imposed upon him in favor of the party injured. This principle is a familiar one, and is based upon the maxim, which has been carried into our Code (Civ. Code, section 3517), that no one may profit by his own wrong. The instances of its application are as various nearly as the ways in which property can be wrongfully acquired.'"

The Court rejects the offered evidence of conviction of manslaughter and the recommendation of the sentencing Judge. These have been urged as the basis for rejection of the wrongdoer's claim. It is the duty of this Court to examine the facts itself and make its own determination, without suggestion from the judgment of court which adjudicated the criminal case.

The evidence establishes that beneficiary and insured were intoxicated; that they quarrelled. The quarrel developed to violence. The beneficiary intended to commit an assault upon the insured. This purpose matured into an aggravated battery. He intended either to physically repulse a critical, abusive tongue, or to administer chastisement. He did not intend more. Without conflict the evidence convincingly rebuts any suggestion that he intended to kill. The Court classifies the violence and its result as manslaughter.

In California, manslaughter is either voluntary or involuntary. It is defined in Penal Code of California, Section 192, as follows:

"Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; * *."

Subsection 3 of Penal Code of California, Section 192, relates to manslaughter in the driving of a vehicle and has no application to the instant case.

 The basic distinction between voluntary manslaughter and involuntary manslaughter is that the former involves an intent to kill, and in the latter the killing is unintentional. People v. Kelley, 24 Cal. App. 54, 140 P. 302; People v. Miller, 114 Cal.App. 293, 299 P. 742; People v. Freel, 48 Cal. 436.

 It is well settled that where a defendant, engaged in fighting with another, inflicted injuries from which the victim died, but this without intent to take life, the killing amounted to involuntary manslaughter. People v. Miller, supra; People v. Mullen, 7 Cal.App. 547, 94 P. 867.

In People v. Chutuk, 18 Cal.App. 768, 124 P. 566, the defendant became involved in a controversy with one Webb. The Court said, 18 Cal.App., at page 770, 124 P. at page 567:

"* * * Both parties seem to have become very angry over the controversy. Both were unarmed. Webb, however, at the conclusion turned to go to his house, when defendant and appellant struck him a violent blow with his fist on the side of the jaw and neck, causing a fracture of both jaws and the thyroid and critoid cartilages. Webb from the injuries received from the blow shortly thereafter died. There can be no question but that the record discloses the unlawful killing by defendant. It may not have been intended, but resulted from an unlawful act, not amounting to a felony, and was therefore manslaughter. * *"

The Effect of Manslaughter Committed by Insurance Beneficiary of Victim.

In Throop v. Western Indemnity Co., 49 Cal.App. 322, 193 P. 263, 264, the Court said:

"The rule which, in our opinion, should prevail in this case, is clearly stated in Schreiner v. High Court of Illinois Catholic Order of Foresters, 35 Ill.App. 576, and was there stated as follows: 'No homicide which is the result of carelessness, or which is not an intentional killing, should bar plaintiff's rights to the money on her certificate. A contract of insurance, or a certificate like the one in suit, impliedly assumes the risk of all carelessness by every person, whether a possible beneficiary under the contract or not, from which the death of the insured may result, unless such acts of carelessness are especially excepted; therefore a death which is unintentional, though caused by some neglect or unlawful act of the beneficiary, is within the contract, and ought not to defeat the policy. * * *"

The facts of the Throop case included gross negligence, found by the Court to be such, but not the intent which would classify the manslaughter as voluntary. Throop handled a shot gun with such carelessness that it discharged, killing his wife who was nearby.

The Schreiner case, upon which the Court based its legal decision in Throop v. Western Indemnity Co., has been cited as authority by the California Law Review on two separate occasions. In an article entitled "Public Policy as Affecting Property Rights Accruing to a Party as a Result of Wrongful Acts", 1 Cal. Law Review 513 treats of the Schreiner case thus:

"* * * In 1899 it was held in Illinois that the death of the insured caused by manslaughter by the beneficiary was not enough to relieve the insurer even as against the beneficiary, as no homicide not intentional should bar the beneficiary's right. This, it is submitted, is the proper view * *".

The California Law Review cited the Schreiner case again in 1932, 20 Cal. Law Review 210, 211 (1932), commenting:

"* * * If the killing of the insured by the beneficiary occurred * * accidentally, whether or not there was negligence, the rights of the beneficiary under the policy are not affected."

The rule is succinctly stated in 14 Cal. Jur., Page 589, Section 124, as follows:

"* * * Where one insures his own life for the benefit of another, and the beneficiary murders the person insured, public policy precludes the beneficiary recovering from the insurance company. This rule does not apply, however, where the killing was accidental, or even where it was intentional if done in lawful self-defense. Nor does the rule apply where death results from such gross negligence of the beneficiary that he is guilty of involuntary manslaughter."

Metropolitan Life Ins. Co. v. McDavid, D.C., 39 F.Supp. 228, treats of the effect of voluntary manslaughter on the right of a beneficiary to receive the life insurance. Mrs. McDavid took possession of her angry husband's loaded gun to protect him from using it in a quarrel he was deliberately about to commence with a third person. In the course of the quarrel which Mrs. McDavid witnessed, the husband grievously insulted his wife and unjustifiably assaulted her. On sudden impulse she shot him. The Court, in refusing her recovery of his insurance, placed its denial on grounds of public policy. 15 Southern California Law Review 103, 104 (1941) criticized the holding:

"* * * One reason often given by the courts for not allowing the murderer to recover, as beneficiary, is that of public policy. They say that public policy forbids that contracts shall receive such an interpretation as will encourage crime, and that to hold otherwise would be to furnish the party interested the strongest temptation to bring about, if possible, the event insured against. This reasoning would explain why the courts will not allow recovery to the beneficiary who has deliberately killed the insured for the insurance, i.e., murder in the first degree. It would also explain why the courts do not allow recovery by the beneficiary who has been found guilty of involuntary manslaughter, because the crime is of such a nature that allowing recovery would not encourage its commission. This reasoning, however, does not explain why the court, in the principal case, refused recovery to the beneficiary who was found guilty of voluntary manslaughter. Now allowing beneficiaries to enjoy the proceeds of insurance, would not deter them from committing voluntary manslaughter upon the insured, because, by definition a killing to collect insurance would not be voluntary manslaughter, but would be murder in the first degree. Also the public policy reasoning would not explain why the courts refuse recovery to the beneficiary convicted of murder in the second degree or felony murder, because in neither of those crimes is there the deliberation or premeditation which could be deterred by not allowing recovery. Thus, if the public policy reasoning were carried through to its logical conclusion, there is no reason why the courts should not allow recovery to the beneficiary in the case of voluntary manslaughter, murder in the second degree and felony murder. * * * It is, therefore, submitted that the reason for not allowing recovery by the beneficiary in the case of murder and voluntary manslaughter and allowing recovery in the case of involuntary manslaughter is illogical."

Counsel treat the cited cases as in conflict. This Court does not. There may be some conflict of words but not of holding. Public policy plays a serious role in the decision of this type of case. So does the old maxim now codified in California as Civil Code Section 3517:

"No one can take advantage of his own wrong. (Enacted 1872.)"

The problem of applying public policy and the old principle now stated in California Civil Code 3517 to cases of this nature centers about the definition of "wrong" in this type of case. Mr. Throop committed a wrong when he carelessly toyed with a loaded shot gun in front of

his wife. But his acts which led to the discharge of the gun with fatal results did not proceed from an intent to do any wrong. His was a Tort of omission, rather than of commission. He did not intend to do any illegal act. He was careless and negligent, even grossly negligent. He did not intend to hurt his wife to any extent. In this he differed from Mrs. McDavid. Her intent was generated and executed on a sudden quarrel, so it was robbed of malice and her crime but manslaughter. Mr. Pounds' intent differed from Mr. Throop's. The latter meant only to handle a gun. In this he disregarded rules of safety. Mr. Pounds intended to manhandle his wife. He meant to commit battery. He committed a very substantial battery. Public policy is against chastisement of the kind he intended to administer his wife. Public policy abhors settlement of disputes, even marital quarrels, by violence. When Mr. Pounds went against that public policy, it rose up to bar him from benefiting from even its unintended consequences. The Court is convinced he did not intend the result. Conviction is equally firm that he did intend to inflict hard physical blows upon his wife. He wilfully entered a forbidden activity of a kind which often brings about results of the sort which developed here. His offense was not mere negligence. He intended to do a physical hurt. He cannot benefit from the miscalculation which led him to injure beyond his intention. Although guilty only of involuntary manslaughter, the wrong out of which the manslaughter grew was wilful and of a type known sometimes to produce the result which it did produce. This bars him from profiting thereby.

The question next arises: From what is this beneficiary barred? He is not called upon to forfeit any property already vested in him. The equitable maxim is a hand which raises a bar to recovering profit. It is not a scoop to lift from him what he has already properly acquired.

Penal Code of California, Sec. 2604:

"(Forfeiture of property on conviction.) No conviction of any person for a crime works any forfeiture of any property, except in cases in which a forfeiture is expressly imposed by law; * * *." Added by Stats.1941, ch. 106, § 15.

The definition of community property is drawn from certain sections of the Civil Code of California which read as follows:

"§ 162. Separate property of the wife. All property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is her separate property. The wife may, without the consent of her husband, convey her separate property. (Enacted 1872.)"

"§ 163. Separate property of the husband. All property owned by the husband before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is his separate property. (Enacted 1872.)"

"§ 161a. (Interests in community property.) *The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing and equal interests* under the management and control of the husband as is provided in sections 172 and 172a of the Civil Code. This section shall be construed as defining the respective interests and rights of husband and wife in the community property. (Added by Stats. 1927, p. 484.)" (Emphasis supplied.)

"§ 172. (Management of community personal property: Limitations: Consent of wife.) The husband has the management and control of the community personal property, with like absolute power of disposition, other than testamentary, as he has of his separate estate; provided, however, that he cannot make a gift of such community personal property, or dispose of the same without a valuable consideration, or sell, convey, or encumber the furniture, furnishings, or fittings of the home, or the clothing or wearing apparel of the wife or minor children.

that is community, without the written consent of the wife. (Enacted 1872; Am.Stats. 1891, p. 425; Stats. 1901, p. 598; Stats. 1917, p. 829.)"

■ The husband has management and control of community property in a representative capacity. Bank of America Nat. Trust & Savings Ass'n v. Rogan, Collector of Internal Revenue, D.C., 33 F.Supp. 183. A husband is absolute owner of one-half of the community property. His wife is like owner of the other one-half. The husband has management and control of all of the community estate. In re Estate of Mc-Nutt, 36 Cal.App.2d 542, 98 P.2d 253.

■ The evidence shows that the insurance policies were purchased while decedent and Mr. Pounds were husband and wife resident in California. There is no evidence suggesting that they are not community property. The evidence on the subject creates a record in this case which is consistent with the strong presumption that the policies are community property. See In re Freitas, D.C., 16 F.Supp. 557, at page 560:

"* * * As to money deposited in a bank by husband or wife, after marriage, the presumption is that it is community property. (Citing cases) A like presumption applies to *all* personal property acquired after marriage, no matter in whose name the title stands. * * *" (Emphasis theirs.)

See also, Cal.Jur.Supp., Vol. 3, Sec. 61, p. 553:

"Presumption That Property Is Community—In General.—The presumption that all property acquired during the marriage, except that acquired by a married woman, or by a married woman and another, by an instrument in writing, is community property, is fundamental in the community system, and has been frequently announced. * * *"

In re Estate of Jolly, 196 Cal. 547, 553, 238 P. 353, 355, holds:

" 'The disputable presumption raised by section 164, Civil Code, is a form of evidence under the expressed terms of section 1957, Code [of] Civ.Proc. It may be controverted by other evidence, direct or indirect, but, unless so controverted, the court or jury is bound to find according to the presumption.' Stafford v. Martinoni, 192 Cal. 724, 221 P. 919. 'The community (property) generically embraces all property belonging to the spouses, except such as the statute specifically removes from its operation. *Community property is the rule, separate property the exception thereto.* * * *' * * *". (Emphasis supplied.)

De Funiak's "Principles of Community Property" (1943) treats of the many circumstances wherein interests in life insurance must be measured by community property law. Of the particular fact situation in this case, the work says, at Page 214:

"* * * it is usually considered by most courts that, when a spouse, during marriage, takes out a policy on his or her own life and the premiums are paid from community funds, the policy represents community property. * * *".

Among the citations given by the author in support of his text are In re Castagnola's Estate, 68 Cal.App. 732, 230 P. 188; and In re Brown's Estate, 124 Wash. 273, 214 P. 10. See also, Dixon Lumber Company v. Peacock, 217 Cal. 415, 19 P.2d 233.

■ The principle that no one can take advantage of his own wrong prevents Mr. Pounds from taking his wife's share of the proceeds of the insurance policy. The principle that respects the integrity of a vested interest in property protects Mr. Pounds from having his interest in the insurance taken from him.

The proceeds of the life insurance policies must be divided equally between defendant George W. Pounds and defendant Frances G. Harrison as Administratrix of the Estate of Lucille E. Pounds, Deceased.

Counsel for George W. Pounds will submit Findings of Fact, Conclusions of Law, and Judgment in harmony with this Opinion. Each party will bear his/her costs.